# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA
### EASTERN DIVISION

JEFFREY M.,

        Plaintiff,

vs.

KILOLO KIJAKAZI,
Acting Commissioner of Social
Security,

        Defendant.

No. 6:22-CV-02018-LRR

**ORDER**

_____

I.     *INTRODUCTION* ................................................................... 2

II.    *RELEVANT PROCEDURAL BACKGROUND* ..................................... 2

III.   *ALJ's FINDINGS* ................................................................... 3

IV.   *STANDARD OF REVIEW* ........................................................... 5

V.    *RELEVANT FACTUAL BACKGROUND* ........................................... 6

VI.   *ANALYSIS* ........................................................................... 7

     1.   *Whether the ALJ Properly Considered Plaintiff's Subjective Complaints When Formulating Claimant's Residual Functional Capacity Assessment* ........................................................... 7

     2.   *Whether the ALJ Articulated Sufficient Reasons to Find the Opinions of ARNP Shelby Allen-Benitz and LISW R. Lang, Jr. to be Unpersuasive* ........................................................... 12

     3.   *Whether the ALJ that Decided Plaintiff's Claim was Constitutionally Appointed by Acting Commissioner Berryhill During Berryhill's Second Term as Acting Commissioner* ............ 14

VII.   *CONCLUSION* ..................................................................... 29

# I.  INTRODUCTION

The matter before the court is the Complaint (docket no. 4) filed by Plaintiff Jeffrey M. ("Plaintiff"), requesting judicial review of the Social Security Commissioner's ("Commissioner") decision to deny his application for Title II disability insurance benefits ("DIB") under 42 U.S.C. Sections 401-434 and Title XVI supplemental security income ("SSI") under 42 U.S.C. Sections 1381-1385.  Plaintiff asks that the court reverse the decision of the Commissioner and order the Commissioner to provide him disability insurance and/or supplemental security income benefits.  In the alternative, Plaintiff asks that the court remand this matter for further proceedings.

# II.  RELEVANT PROCEDURAL BACKGROUND

On February 13, 2019, Plaintiff protectively filed applications for DIB and SSI, with both alleging disability due to major depressive disorder, post-traumatic stress disorder ("PTSD") due to childhood abuse, eating disorder, attention deficit hyperactivity disorder ("ADHD"), obesity, irritable bowel syndrome ("IBS"), skin cancer in remission and high blood pressure.  Administrative Record ("R") at 196, 199, 201, 372.  Plaintiff claims that he became disabled on May 15, 2018.  *Id*. at 368.  His applications were denied upon initial review and on reconsideration.  *Id*. at 108, 112, 116, 120.  On July 12, 2021,  Plaintiff appeared with his attorney for a hearing before Administrative Law Judge Kim Fields ("ALJ").  *Id*. at 30-67.  In a decision dated July 21, 2021, the ALJ denied Plaintiff's claims.  *Id*. at 10-29.  On  July 21, 2021, Plaintiff appealed the ALJ's decision, and the Appeals Council denied review on March 9, 2022.  *Id*. at 1-7, 194.

On April 27, 2021, Plaintiff filed the instant action for judicial review.  *See* docket no. 1.  A briefing schedule was entered on July 14, 2022.  *See* docket no. 9.  An order issued on November 21, 2022, modified the briefing schedule.  *See* docket no. 13.  On October 12, 2022, Plaintiff filed the Plaintiff's Brief ("Plaintiff's Brief") (docket no. 12).  On December 5, 2022, the Commissioner filed the Defendant's Brief ("Commissioner's

Brief") after receiving an extension of time to file (docket nos. 16, 17). On December 12, 2022, Plaintiff filed the Reply Brief (docket no. 18). Additionally, on September 26, 2022, the parties filed the Joint Statement of Facts (docket no. 11). The matter is fully submitted and ready for decision.

## III. ALJ's FINDINGS

The ALJ determined that Plaintiff was not entitled to disability insurance benefits or supplemental security income benefits because he was functionally capable of performing work available in the general economy. R at 23. In making this determination, the ALJ followed the five-step sequential process required by the social security regulations for assessing whether a claimant is under a disability. *See* 20 C.F.R. §§ 404.1520(a)(4)(i)-(v), 416.920(a)(4)(i)-(v); *Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987); *Swink v. Saul*, 931 F.3d 765, 769 (8th Cir. 2019); *Moore v. Colvin*, 769 F.3d 987, 988 (8th Cir. 2014). The five steps an ALJ must consider are 1) whether the claimant is currently employed; (2) whether the claimant is severely impaired; (3) whether the impairment is or approximates an impairment listed in Appendix 1; (4) whether the claimant can perform past relevant work; and, if not, (5) whether the claimant can perform any other kind of work. *Id.*; *see also* 20 C.F.R. §§ 404.1520(a)(4)(i)-(v), 416.920(a)(4)(i)-(v). "If a claimant fails to meet the criteria at any step in the evaluation of disability, the process ends and the claimant is determined to be not disabled." *Pelkey v. Barnhart*, 433 F.3d 575, 577 (8th Cir. 2006).

In considering the steps in the five-step process, the ALJ:

first determines if the claimant engaged in substantial gainful activity. If so, the claimant is not disabled. Second, the ALJ determines whether the claimant has a severe medical impairment that has lasted, or is expected to last, at least 12 months. Third, the ALJ considers the severity of the impairment, specifically whether it meets or equals one of the listed impairments. If the ALJ finds a severe impairment that meets the duration requirement, and meets or equals a listed impairment, then the claimant is disabled. However, the fourth step asks whether the claimant has the

3

residual functional capacity to do past relevant work.  If so, the claimant
can perform other jobs in the economy.  If so, the claimant is not disabled.

*Kluesner v. Astrue*, 607 F.3d 533, 537 (8th Cir. 2010).  At the fourth step, the claimant
"bears the burden of demonstrating an inability to return to [his] or her past relevant
work." *Jones v. Astrue*, 619 F.3d 963, 971 (8th Cir. 2010) (quoting *Pate-Fires v. Astrue*,
564 F.3d 935, 942 (8th Cir. 2009)).  If the claimant is unable to return to his relevant
past work, then, at step five, the burden shifts to the Commissioner to demonstrate that
"the claimant has the physical residual functional capacity [("RFC")] to perform a
significant number of other jobs in the national economy that are consistent with [his or]
her impairments and vocational factors such as age, education, and work experience."
*Phillips v. Astrue*, 671 F.3d 699, 702 (8th Cir. 2012) (quoting *Holley v. Massanari*, 253
F.3d 1088, 1093 (8th Cir. 2001)). The RFC is the most an individual can do despite the
combined effect of all of his or her credible limitations.  *See* 20 C.F.R. §§ 404.1545(a),
416.925(a); *Toland v. Colvin*, 761 F.3d 931, 935 (8th Cir. 2014).  The ALJ bears the
responsibility for determining "a claimant's RFC based on all the relevant evidence,
including the medical records, observations of treating physicians and others, and an
individual's own description of [his or] her limitations." *Myers v Colvin*, 721 F.3d 521,
527 (8th Cir. 2013) (quoting *McKinney v. Apfel*, 228 F.3d 860, 863 (8th Cir. 2000)); *see
also* 20 C.F.R. §§ 404.1545, 416.945.

        In the case at bar, the ALJ determined that Plaintiff met the insured status
requirements through December 31, 2025.  R at 15.  The ALJ then applied the first step
of the analysis and determined that Plaintiff had not engaged in substantial gainful activity
from his alleged onset date of May 16, 2018.  *Id*.  At the second step, the ALJ concluded
from the medical evidence that, through the date last insured, Plaintiff had the following
severe impairments: PTSD and depression.  *Id*. at 16.  At the third step, the ALJ found
that, through the date last insured, Plaintiff did not have an impairment or combination
of impairments listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1.  *Id*.  At the fourth step,

the ALJ determined that, through the date last insured, Plaintiff had the capacity to perform a full range of work at all exertional levels but with the following limitations:

> [Plaintiff] can perform no more than simple, routine tasks and make no more than simple work-related decisions. He can only occasionally interact with supervisors, the public and coworkers.

*Id*. at 17-18. Also at the fourth step, the ALJ determined that, through the date last insured, Plaintiff was not able to perform his past relevant work as a machine operator. *Id*. at 21. At the fifth step, the ALJ determined that Plaintiff was capable of performing jobs available in the national economy as a janitor, warehouse worker and hand packager. *Id*. at 22. Therefore, the ALJ concluded that Plaintiff was not disabled. *Id*. at 23.

## IV.   STANDARD OF REVIEW

The Commissioner's final determination not to award disability insurance benefits is subject to judicial review. *See* 42 U.S.C. §§ 405(g), 1383(c)(3). The court has the power to "enter . . . a judgment affirming, modifying, or reversing the decision of the Commissioner. . . with or without remanding the cause for a rehearing." *Id*. The Commissioner's factual findings shall be conclusive "if supported by substantial evidence." *Id*. An ALJ's decision must be affirmed "if it is supported by substantial evidence in the record as a whole." *Grindley v. Kijakazi*, 9 F.4th 622, 627 (8th Cir. 2021) (quoting *Pickney v. Chater*, 96 F.3d 294, 296 (8th Cir. 1996)). "Substantial evidence 'is less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a conclusion.'" *Kraus v. Saul*, 988 F.3d 1019, 1024 (8th Cir. 2021) (quoting *Phillips*, 671 F.3d at 702).

In determining whether the Commissioner's decision meets this standard, the court considers "all of the evidence that was before the [administrative law judge ("ALJ")], but [it] do[es] not re-weigh the evidence." *Vester v. Barnhart*, 416 F.3d 886, 889 (8th Cir. 2005). The court considers "both evidence that detracts from the Commissioner's decision, as well as evidence that supports it." *Fentress v. Berryhill*, 854 F.3d 1016, 1020 (8th Cir. 2017); *see also Cox v. Astrue*, 495 F.3d 614, 617 (8th Cir. 2007)

5

(providing that review of the Commissioner's decision "extends beyond examining the record to find substantial evidence in support of the [Commissioner's] decision" and noting that the court must also "consider evidence in the record that fairly detracts from that decision"). The Eighth Circuit Court of Appeals explained this standard as follows:

> This standard is "something less than the weight of the evidence and it allows for the possibility of drawing two inconsistent conclusions, thus it embodies a zone of choice within which the [Commissioner] may decide to grant or deny benefits without being subject to reversal on appeal."

*Culbertson v. Shalala*, 30 F.3d 934, 939 (8th Cir. 1994) (quoting *Turley v. Sullivan*, 939 F.2d 524, 528 (8th Cir. 1991)). A court "will disturb the ALJ's decision only if it falls outside the available zone of choice." *Kraus*, 988 F.3d at 1024 (quoting *Hacker v. Barnhart*, 459 F.3d 934, 936 (8th Cir. 2006)). "An ALJ's decision is 'not outside the zone of choice' simply because [the c]ourt 'might have reached a different conclusion had [it] been the initial finder of fact.'" *Kraus*, 988 F.3d at 1024 (quoting *Bradley v. Astrue*, 528 F.3d 1113, 1115 (8th Cir. 2008)). Therefore, "even if inconsistent conclusions may be drawn from the evidence, the [Commissioner's] decision will be upheld if it is supported by substantial evidence on the record as a whole." *Guilliams v. Barnhart*, 393 F.3d 798, 801 (8th Cir. 2005); *see also Igo v. Colvin*, 839 F.3d 724, 728 (8th Cir. 2016) (providing that a court "may not reverse simply because [it] would have reached a different conclusion than the [Commissioner] or because substantial evidence supports a contrary conclusion").

## V.     RELEVANT FACTUAL BACKGROUND

On September 26, 2022, the parties filed the Joint Statement of Facts (docket no. 11), which addresses Plaintiff's background, the case's procedural history, testimony from the administrative hearings, and Plaintiff's medical history. The Joint Statement of Facts is hereby incorporated by reference. Further discussion of pertinent facts will occur, as necessary, in the court's consideration of the legal issues presented.

Plaintiff was born in 1976.  R at 368.  He obtained a GED in 1994.  *Id*. at 373. In the past he worked full-time as a machine operator and part-time as a janitor and woodworker.  *Id*. at 374.

## VI.    ANALYSIS

### 1.    *Whether the ALJ Properly Considered Plaintiff's Subjective Complaints When Formulating Claimant's Residual Functional Capacity Assessment*

#### a.  *Parties' Arguments*

Plaintiff argues that the ALJ erred by rejecting his claims that he is limited in his ability to interact with others and respond appropriately to criticism without considering the record in its entirety.  *See* Plaintiff's Brief at 4-9.  Plaintiff alleges that the ALJ further erred when she ignored evidence which indicated that Plaintiff was unable to sustain employment on a consistent basis even when placed in sheltered workshops and assigned a job coach to assist him in completing work duties and maintaining employment. *Id*.  Additionally, Plaintiff alleges that the ALJ erred in finding Plaintiff was not credible regarding his complaints because his doctors had not prescribed transcranial magnetic stimulation or electroconvulsive therapy.  *Id*. at 10.

The Commissioner asserts that the ALJ properly considered Plaintiff's subjective complaints. S*ee* Commissioner's brief at 5-10.  Additionally, the Commissioner asserts that the ALJ properly considered that Plaintiff's mental health treatment was routine and conservative.  *Id*. at 8.

#### b.  *Applicable Law*

It is the claimant's burden to prove her functional limitations, not the ALJ's burden to prove the claimant's functional capabilities.  *See Baldwin v. Barnhart*, 349 F.3d 549, 556 (8th Cir. 2003) (citing *Pearsall v. Massanari*, 274 F.3d 1211, 1218 (8th Cir. 2001)); *accord Charles v. Barnhart*, 375 F.3d 777, 782 (8th Cir. 2004).

The assessment of a claimant's credibility is a factor used in the determination of a claimant's residual functional capacity to perform work. An ALJ must consider the following factors when evaluating a claimant's credibility: (1) the claimant's daily activities; (2) the duration, intensity, and frequency of pain; (3) the precipitating and aggravating factors; (4) the dosage, effectiveness, and side effects of medication; (5) any functional restrictions; (6) the claimant's work history; and (7) the absence of objective medical evidence to support the claimant's complaints. *Buckner v. Astrue,* 646 F.3d 549, 558 (8th Cir. 2011) (otherwise known as the *Polaski* factors from *Polaski v. Heckler,* 739 F.2d 1320, 1321–22 (8th Cir. 1984)).

The "credibility of a claimant's subjective testimony is primarily for the ALJ to decide, not the courts." *Moore v. Astrue,* 572 F.3d 520, 524 (8th Cir. 2009). Consequently, courts should defer to the ALJ's credibility finding when the ALJ explicitly discredits a claimant's testimony and gives good reason to do so. *Buckner,* 646 F.3d at 558. Although an ALJ need not explicitly discuss each *Polaski* factor in his or her decision, he or she must at least acknowledge and consider the factors. *See Renstrom v. Astrue,* 680 F.3d 1057, 1067 (8th Cir. 2012) ("The ALJ is not required to discuss methodically each *Polaski* consideration, so long as he acknowledged and examined those considerations before discounting a claimant's subjective complaints"). Thus, while the ALJ may not simply reject a claimant's testimony out of hand, the ALJ is not obliged to simply accept testimony as credible without consideration as to the consistency of that testimony with the record as a whole.

While this Court may not resolve conflicts in evidence or decide questions of credibility, it is appropriate for the Court to look to portions of the record the ALJ did not discuss or cite when assessing whether a decision is supported by substantial evidence. *See Lewis v. Barnhart*, 353 F.3d 642, 645 (8th Cir. 2003) ("The review we undertake is more than an examination of the record for the existence of substantial evidence in support of the Commissioner's decision; we also take into account whatever in the record fairly detracts from the decision.").

8

"The basic mental demands of competitive, remunerative, unskilled work include the abilities (on a sustained basis) to understand, carry out, and remember simple instructions; to respond appropriately to supervision, coworkers, and usual work situations; and to deal with changes in a routine work setting." *Titles II & XVI: Capability to Do Other Work—The Medical-Vocational Rules as a Framework for Evaluating Solely Nonexertional Impairments*, SSR 83-15, 1985 WL 56857, at *4 (Social Sec. Admin. Jan. 1, 1985).

The Social Security Act describes sheltered work as work "done under special conditions," including simple tasks by a handicapped person under close and continuous supervision, or where the employer pays more for the work than the value of the work that is performed, in effect subsidizing the work. 20 C.F.R. § 404.1574(a)(2), § 416.974(a)(2) ("[w]e consider your work to be subsidized if the true value of your work, when compared with the same or similar work done by unimpaired persons, is less than the actual amount of earnings paid to you for your work"). Evidence of sheltered work does not indicate an ability to engage in substantial gainful activity. *Iamarino v. Heckler,* 795 F.2d 59, 60 (8th Cir.1986).

### c. Application and Discussion

Initially, the court finds that while it is not improper for an ALJ to consider whether Plaintiff has received conservative and routine care, the ALJ made a much more specific finding. The ALJ specifically found that Plaintiff's complaints were not credible because he was not prescribed transcranial magnetic stimulation or electroconvulsive therapy and indicated that the lack of such therapy was an indication Plaintiff's condition was not severe. R at 20. The ALJ offered no explanation as to why she reasoned that this particular treatment was indicated in Plaintiff's case as necessary to establish severity. Additionally, there is nothing in the regulations or rulings which support a finding that this specific treatment is necessary to establish severity. Thus, the ALJ has failed to provide proper articulation as to her reasoning that the lack of this specific therapy is an indication Plaintiff's condition is not severe.

9

The court finds Plaintiff's argument persuasive that the ALJ did not consider the entire record in assessing his credibility. In his reply brief, plaintiff argues that employers would need to regulate their interactions with Plaintiff in order for him to retain employment. *See* Reply brief at 2. This is supported by the record. On July 1, 2018, Plaintiff's medical and vocational providers created a treatment plan to assist him in maintaining employment which included the assistance of a job coach. R at 745-754. Plaintiff worked with the job coach in place in July and August but on August 22, 2018, left his work without notice to anyone including his job coach because he stated he "could not take it anymore." *Id*. at 462. On September 13, 2018, NIVC Services Inc. (a/k/a Job Link and Affordables) ("NVIC"), a non-profit organization providing employment training and support services, created a vocational service plan which provided for continued job coaching as well as placement in a job suited to Plaintiff. *Id*. at 454. Plaintiff was placed in a job and worked on January 21-22, 2019, with the job coach on site. *Id*. at 463. On January 23, 2019, without the job coach on site, Plaintiff became concerned and left the job without notice. *Id*. at 464.

Throughout his therapy Plaintiff complained of poor treatment by supervisors or unsafe work conditions. *Id*. at 404, 464, 721, 731, 762, 813, 46, 856, 892, 940. In August of 2019, Plaintiff was placed in a supported position at Martin Brothers by NVIC with job coaching. *Id*. at 811. Plaintiff was discharged from his position at Martin Brothers because he was not able to learn additional tasks despite job coaching. *Id*. at 815, 825. Plaintiff obtained supported employment with a church but had difficulty interacting with the pastor. *Id*. at 846, 848, 892, 898, 940. Although Plaintiff's job coach was not able to attend work with him at the church, she counseled him regarding that employment. *Id*. at 475.

Every medical source who rendered an opinion as to Plaintiff's mental impairments opined that Plaintiff would require supportive services in the workplace or would be unable to meet competitive standards. On July 1, 2019, state agency psychological consultant, Scott Schafer, Ph.D., opined that Plaintiff would require

10

"emotional support" to adjust to changes in the workplace. *Id.* at 76. This opinion was affirmed on reconsideration by state agency consultant, Aidaluz Tirado, Ph.D., who also opined that Plaintiff would be able to adjust to changes "with emotional support." *Id.* at 96. On May 5, 2021, Shelby Allen-Benitz, ARNP, opined that "stress tolerance is an issue for [Plaintiff]" and that he would "struggle with routine aspects of competitive employment." *Id.* at 932. On July 1, 2021, R. Lang, Jr., LISW, Plaintiff's therapist, opined that a "realistic occupational goal, requires professionally supported employment for [Plaintiff]." *Id.* at 942.

Plaintiff's job coach, Lynda Oetken, completed a statement on May 24, 2021. *Id.* at 475-476. She stated that she had worked with Plaintiff as a job coach since October of 2018 through NVIC. *Id.* at 475. She stated that she needed to talk to Plaintiff to support him emotionally because he became stressed easily and would "walk out." *Id.* Ms. Oetken stated that Plaintiff's jobs offered through Links/NVIC offered accommodations such as flexible hours. *Id.* Ms. Oetken further stated that on average Plaintiff performs work twenty-five percent slower than other employees. *Id.* She stated that Plaintiff would be able to work five hours per day at most without becoming too stressed. *Id.* Ms. Oetken stated that Plaintiff would require easier duties, irregular hours and to be able to work at his own pace in order to maintain employment. *Id.* at 476.

The ALJ failed in any meaningful way to address the consistency of the medical opinions regarding the need for supportive services, both as it related to Plaintiff's subjective complaints and as they related to each other. Additionally, the ALJ failed to address the evidence in the record that Plaintiff struggled to perform in supported work environments with job coaching services in place.

Thus, having reviewed the record, the court finds that the ALJ failed to meaningfully address all of the factors necessary under *Polaski*. Accordingly, the court remands the case to the Commissioner with the direction that the ALJ address the evidence contained in the record regarding the need for "support" when working.

11

### 2. Whether the ALJ Articulated Sufficient Reasons to Find the Opinions of ARNP Shelby Allen-Benitz and LISW R. Lang, Jr. to be Unpersuasive

#### a. The Parties' Arguments

Plaintiff alleges that the ALJ erred in finding that the opinions of the treating sources, ARNP Shelby Allen-Benitz and LISW R. Lang, Jr., were unpersuasive. *See* Plaintiff's Brief at 12-16. Plaintiff argues that the ALJ erred because she did not address the supportability factor as required by the regulations. *Id*. at 15. Plaintiff argues further that the ALJ erred by not considering Mr. Lang's opinions as a whole and failed to consider evidence that when stress became too much for Plaintiff to handle, he walked off multiple job sites. *Id*. at 16.

The Commissioner counter-argues that the ALJ properly considered ARNP Allen-Benitz's opinions when she found that the opinions were "at odds with Plaintiff's presentation on examination and his conservative health treatment." *See* Commissioner's Brief at 10-11. The Commissioner argues further that the ALJ properly considered LISW Lang's opinions and found that the opinion "was not supported by his treatment notes and was inconsistent with Plaintiff's mental health history. *Id*. at 13-14.

#### b. Applicable Law

The standard for evaluating medical opinion evidence for cases filed after March 27, 2017, is articulated in 20 C.F.R. §§ 404.1520c, 416.920c. Under the current rules, no medical opinion is automatically given controlling weight but instead is considered based on the persuasiveness of the opinion. *See* 20 C.F.R. §§ 404.1520c(a), 416.920c(a). Opinions from medical sources are evaluated using the following factors: (1)

12

supportability; (2) consistency; (3) provider's relationship with the claimant; (4) specialization; and (5) other factors. *See* 20 C.F.R. § 404.1520c(c), 416.920c(c).

Supportability and consistency are the most important factors when determining "how persuasive the ALJ find[s] a medical source's medical opinions . . . to be." 20 C.F.R. §§ 404.1520c(b)(2), 416.920c(b)(2). The ALJ "may, but [is] not required to, explain how [he or she] considered the factors in paragraphs (c)(3) through (c)(5)." *Id.* An opinion is more persuasive if it is consistent with and supported by the medical evidence as a whole. *See* 20 C.F.R. §§ 404.1520c(c)(1-2), 416.920c(c)(1-2).

Supportability concerns the internal consistency a source's opinion has with the source's own findings and notes. "The more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) . . ., the more persuasive the medical opinions . . . will be." 20 C.F.R. §§ 404.1520c(c)(1), 416.920c(c)(1).

Consistency concerns the external consistency the source's opinion has with the findings and opinions of other sources. "The more consistent a medical opinion . . . is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion . . . will be." 20 C.F.R. §§ 404.1520c(c)(2), 416.920c(c)(2).

In considering the consistency of a medical opinion with the record as a whole, an ALJ may consider a claimant's daily activities. *Goff v. Barnhart*, 421 F.3d 785, 789 (8th Cir. 2005).

### c. Application and Discussion

Because the case is being remanded to the Commissioner for further proceedings, the court will only briefly address this issue.

Each source that rendered an opinion as to Plaintiff's mental impairments opined that Plaintiff would require supported employment. The ALJ was obliged to consider the consistency of those opinions and failed to do so. This cannot be deemed to be harmless because pursuant to SSR 83-15, 1985 WL 56857, at *4 (Social Sec. Admin. Jan. 1,

13

1985), the basic demands of competitive work require the individual to be able to respond to routine changes in the workplace if supportive services are necessary to do so, this may be considered vocationally to be an accommodation which precludes competitive work. The only vocational testimony which was taken regarding the effect a requirement for supported work would have on the ability to perform competitive employment was addressed in the context of a hypothetical given by Plaintiff's counsel. *Id*. at 64-65. The hypothetical included several other limitations in addition to a limitation to supported work. *Id*. Although the vocational expert responded that work was precluded, the response cannot reasonably be considered to resolve the issue at hand because the expert responded to a query regarding multiple limitations and this limitation was not addressed specifically. Thus, the vocational expert's hearing testimony indicated that the need for job coaching or "emotional support" might preclude competitive work but did not clearly establish that it does. *Id*. This ambiguity should have been resolved.

For this reason, the court directs that on remand the ALJ address the opinions of the medical sources that Plaintiff requires supported work and obtain vocational expert testimony as to the effect that such requirements would have on Plaintiff's ability to perform competitive work.

> **3.** ***Whether the ALJ that Decided Plaintiff's Claim was Constitutionally Appointed by Acting Commissioner Berryhill During Berryhill's Second Term as Acting Commissioner***

### a. The Parties' Arguments

Plaintiff argues that the ALJ who adjudicated her case had no authority to do so because she was not appointed consistent with the provisions of the Federal Vacancies Reform Act ("FVRA"). *See* Plaintiff's Brief at 16-29.

The Commissioner counter-argues that Berryhill was validly serving as Acting Commissioner when she ratified the appointments of all ALJ's hired by SSA and that the

ALJ who rendered the decision in this matter was therefore properly appointed. *See* Commissioner's Brief at 14-30.

In her reply brief, Plaintiff asserts that the legislative history of the FVRA is not clear that there was a springback provision intended and that for that reason the FVRA statutory interpretation must be decided solely on a plain text interpretation. *See* Reply Brief at 5-12.

### b. *Applicable Law*

Statutory interpretation "begins with the text." *Ross v. Blake*, 578 U.S. 632, 638, (2016). It is a fundamental canon of statutory construction that, unless otherwise defined, words will be interpreted as taking their ordinary, contemporary, and common meaning. *Sandifer v. U.S. Steel Corp.,* 571 U.S. 220, 220 (2014). "Statutory construction must begin with the language employed by Congress and the assumption that the ordinary meaning of that language accurately expresses the legislative purpose." *Park 'N Fly, Inc. v. Dollar Park & Fly, Inc.*, 469 U.S. 189, 194 (1985) (citing *American Tobacco Co. v. Patterson*, 456 U.S. 63, 68 (1982)).

Courts "ordinarily resist[ ] reading words or elements into a statute that do not appear on its face." *Dean v. United States*, 556 U.S. 568, 572 (2009) (quoting *Bates v. United States*, 522 U.S. 23, 29 (1997)); *see also Virginia Uranium, Inc. v. Warren*, 139 S. Ct. 1894, 1900 (2019) ("[I]t is our duty to respect not only what Congress wrote but, as importantly, what it didn't write.").

The Eighth Circuit explained that:

> [T]his Court looks to canons of statutory interpretation only when the meaning of a statute is ambiguous or would lead to an illogical result that defeats the purpose of the legislation. This Court interprets statutes in a way that is not hyper-technical, but instead, is reasonable and logical and gives meaning to the statute.

*Behlmann v. Century Sur. Co.*, 794 F.3d 960, 963 (8th Cir. 2015).

The first approach to statutory interpretation is the "plain language" of the statute, which is the "one, cardinal cannon before all others." *Connecticut Nat'l Bank v.*

*Germain,* 503 U.S. 249, 253 (1992). Where the language of the statute is plain, the inquiry ends with the language of the statute. *United States v. Ron Pair Enters., Inc.,* 489 U.S. 235, 241 (1989).

The second cardinal rule of statutory construction is that when the plain text is ambiguous the intent of the legislative assembly is to be given effect. "[T]he Court interprets statutory provisions—including delegations—by reading the text in "context" and in light of the statutory purpose." *National Broadcasting Co. v. United States*, 319 U.S. 190, 214, 216 (1943). *See also Gundy v. United States*, 139 S. Ct. 2116 (2019). But statutes are "contextual as well as textual." *Argosy Ltd. v. Hennigan*, 404 F.2d 14, 20 (5th Cir. 1968). "When interpreting a statute, we must also consider the statutory context in which the words in question appear, including both '"the specific context in which th[e] language is used, and the broader context of the statute as a whole .'" *Designworks Homes, Inc. v. Columbia House of Brokers Realty, Inc.*, 9 F.4th 803, 807 (8th Cir. 2021), *cert. denied,* 142 S. Ct. 2888 (2022). Where a literal interpretation of a statutory provision would not accord with the intended purpose of the legislation, or produces an absurd result, courts must look beyond the plain words of the statute. *United States v. American Trucking Assns.*, 310 U.S. 534, 543 (1940).

Also, "[g]enerally, in the context of statutory interpretation, a word is known by the company it keeps, which is an interpretive principle called 'noscitur a sociis[.]'" *Designworks Homes, Inc.,* 9 F.4th at 803.

### c. Application and Discussion

### 1. The FVRA and Factual Background

The Appointments Clause of the U.S. Constitution requires presidentially appointed "Officers of the United States" to receive Senate confirmation. U.S. Const. art. II, § 2, cl. 2. The Clause "distinguishes between two kinds of officers." *Seila Law LLC v. Consumer Fin. Prot. Bureau*, 140 S. Ct. 2183, 2199 n.3 (2020). The first kind are "principal officers," commonly referred to as PAS officers who must be appointed by the President with the advice and consent of the Senate. *Id.* The second class of

16

officers consists of "inferior officers," who can alternatively also be appointed by the President with the advice and consent of the Senate, but "whose appointment Congress may vest in the President, courts, or heads of Departments." *Id*. at 2199 n.3. But where a vacancy arises and "the President and Senate cannot promptly agree on a replacement," the ensuing delay risks that the PAS office remains unfilled, and its official acts go "unperformed." *N.L.R.B. v. SW General, Inc.*, 137 S. Ct. 929, 934, (2017).

In 1998, Congress enacted the Federal Vacancies Reform Act of 1998 (FVRA) Pub.L. 105–277, Div. C, Title I, § 151, Oct. 21, 1998, 112 Stat. 2681–611, 5 U.S.C. § 3301 et seq. Like the earlier Vacancies Act, the FVRA includes a first-assistant default rule[1], but it permits the President to override that rule. 5 U.S.C. § 3345(a)(1).

The FVRA prescribes time limits for those serving in acting positions in 5 U.S.C. § 3346. It provides that:

(a)     Except in the case of a vacancy caused by sickness, the person serving as an acting officer as described under section 3345 may serve in the office—
    **(1)** for no longer than 210 days beginning on the date the vacancy occurs; or

    **(2)** subject to subsection (b), once a first or second nomination for the office is submitted to the Senate, from the date of such nomination for the period that the nomination is pending in the Senate.

(b)
    **(1)** If the first nomination for the office is rejected by the Senate, withdrawn, or returned to the President by the Senate, the person may continue to serve as the acting officer for no more than 210 days after the date of such rejection, withdrawal, or return.
    **(2)** Notwithstanding paragraph (1), if a second nomination for the office is submitted to the Senate after the rejection, withdrawal, or return of the first nomination, the person serving as the acting officer may continue to serve—
        **(A)** until the second nomination is confirmed; or

---

[1] The Vacancies Act of July 23, 1868, ch. 227, 15 Stat. 168 (1868), a predecessor to the Federal Vacancies Reform Act (FVRA) which established the basic statutory framework that continues to operate today, created a default rule that in the case of a vacancy "of the head of any executive department of the government, the first or sole assistant thereof shall . . . perform the duties of such head until a successor be appointed, or such absence or sickness shall cease." *Id.* § 1, 15 Stat. at 168.

> **(B)** for no more than 210 days after the second nomination is rejected, withdrawn, or returned.

*Id.*

For vacancies existing during the first 60 days after a Presidential transition (as occurred in 2017), the 210-day period runs from the later of 90 days after inauguration or 90 days after the date of the vacancy. 5 U.S.C. § 3349a(b).

There is no dispute that the office of Commissioner of Social Security is an office subject to Presidential nomination and Senate Confirmation, otherwise known as a "PAS" position. *See* 42 U.S.C. § 902. Thus, the court will not address that issue. Similarly, the court will not address whether the FVRA was the exclusive means by which Berryhill might have been appointed because neither party argues that Berryhill was appointed by the alternative statutory provision set forth in the Social Security Act. *See* 42 U.S.C. § 902; *Casa de Maryland, Inc. v. Wolf*, 486 F. Supp. 3d 928, 953 (D. Md. 2020), *appeal dismissed sub nom. Casa De Maryland, Inc. v. Mayorkas*, No. 20-2217 (L), 2021 WL 1923045 (4th Cir. Mar. 23, 2021). Thus, initially, the court finds that Plaintiff is correct that Berryhill's appointment was subject to the FVRA.

Berryhill assumed the role of Acting Commissioner on January 21, 2017, on the resignation of Acting Commissioner Carolyn Colvin[2], pursuant to the *Memorandum Providing an Order of Succession Within the Social Security Administration*, 81 Fed. Reg. 96337, 2016 WL 7487744 (Dec. 23, 2016) (herein "Succession Memo") issued by President Barack Obama on December 23, 2016. That memorandum provided an order

---

[2] Colvin became the Acting Commissioner pursuant to the "first assistant rule" as she was confirmed by the Senate on December 22, 2010, for the position of Deputy Commissioner and was serving in that role on February 13, 2013, when Commissioner Michael Astrue's term in office expired. *See*, Social Security Administration, Social Security Testimony Before Congress, *Testimony of Carolyn Colvin, Acting Commissioner Social Security Administration Regarding Oversight of Federal Disability Programs Before the Oversight and Government Reform Committee U.S. House of Representatives*; https://ssa.gov/legislation/testimony_061114.html. *See also*, March 6, 2018, GAO letter at 1.

of succession within the SSA that placed the Deputy Commissioner for Operations ("DCO") first in line to serve as Acting Commissioner should the positions of Commissioner and Deputy Commissioner both become vacant.[3]  Thus, Berryhill became Acting Commissioner of Social Security on Carolyn Colvin's resignation.

On March 6, 2018, Thomas H. Armstrong, General Counsel for the Government Accounting Office ("GAO"), a non-partisan agency tasked with assuring that the executive branch is operating in compliance with congressional statutes, advised both the SSA and then-President Trump's Administration that Berryhill's term should have ended on November 17, 2017.[4]  Following receipt of the GAO's letter, Berryhill stepped down as Acting Commissioner and once again assumed her title of Deputy Commissioner for Operations.  On April 2, 2018, she signed an announcement for the federal register under the title "Nancy Berryhill, Deputy Commissioner for Operations, performing the duties and functions not reserved to the Commissioner."[5]  *See also* Anne Joseph O'Connell, *Actings*, 120 Colum. L. Rev. 613, 634 (2020).  On April 17, 2018, President Trump nominated Andrew Saul for the position of Commissioner of Social Security.[6]

---

[3] On January 21, 2017, Berryhill was serving as the Deputy Commissioner for Operations.  *See*, Social Security Administration, *Social Security History, SSA Commissioners, Nancy A. Berryhill;* https://ssa.gov/history/Berryhill.html.

[4] *See,* Government Accounting Office*, Violation of the Time Limit Imposed by the Federal Vacancies Reform Act of 1998, Commissioner, Social Security Administration;* https://www.gao.gov/assets/700/690502.pdf.

[5] *Extension of Expiration Dates for Two Body System Listings,* 83 Fed. Reg. 13862 (Apr. 2, 2018).

[6] UPN1849 – *Nomination of Andrew M. Saul for Social Security Administration*, 115th Cong. (2017-2018) 115th Cong. (2019); https://www.congress.gov/nomination/115th-congress/1849?r=9.

After the submission of Saul's nomination on April 17, 2018, Berryhill assumed the title of Acting Commissioner of Social Security for the second time.[7]

On June 21, 2018, the Supreme Court held that ALJs of the Securities and Exchange Commission are inferior "Officers of the United States" within the meaning of the Appointments Clause, and, therefore, the President, a court of law, or department head must appoint them. *See Lucia v. S.E.C.* 138 S. Ct. 2044, 2049 (2018).

On July 16, 2018, "[t]o address any Appointments Clause questions involving Social Security claims, and consistent with guidance from the Department of Justice . . . the Acting Commissioner of Social Security [Nancy Berryhill] ratified the appointments of [the Agency's] ALJs and approved those appointments as her own." Social Security Ruling 19-1p, Titles II and XVI: *Effect of the Decision in Lucia v. Securities and Exchange Commission (SEC) On Cases Pending at the Appeals Council,* 84 Fed. Reg. 9582-02 (Mar. 15, 2019) ("SSR 19-1").

Plaintiff urges the court to rely upon the district court decision *Brian T.D.* which held that the FVRA lacked a "springback" provision which would allow Berryhill to resume service upon the nomination of Andrew Saul as Commissioner of Social Security. Plaintiff's Brief at 16-28.

The Commissioner counter-argues that the *Brian T.D.* decision is an outlier which conflicts with the plain language of the FVRA. *See* Commissioner's Brief at 14-29. Specifically, the Commissioner argues that 5 U.S.C. § 3346(a) provides a single trigger for service as an acting officer during the pendency of a first or second nomination. *Id.* at 16-17.

_____

[7] On May 14, 2018, Berryhill signed an announcement in the Federal Register as "Nancy Berryhill, Acting Commissioner of Social Security." *See*, *Rescission of Social Security Ruling 05-02; Titles II and XVI: Determination of Substantial Gainful Activity if Substantial Work Activity Is Discontinued or Reduced-Unsuccessful Work Attempt*. 83 Fed. Reg. 22308 (May 14, 2018).

2. ***The Plain Language of 5 U.S.C. § 3346 and its Legislative History Support the Interpretation That a Springback Provision Enabled Berryhill's Second Term as Acting Commissioner***.

***i. The plain language of the act does not support a conclusion that an individual must have been serving at the time of nomination in order to assume service pursuant to 5 U.S.C. § 3346 (a)(2).***

This district has rejected the interpretation set forth in *Brian T.D*. *See Bauer v. Kijakazi*, No. 21-CV-2008-KEM, 2022 WL 2918917 (N.D. Iowa July 25, 2022); *Neith v. Kijakazi*, No. 21-cv-2044-LRR-MAR.

In *Brian T.D.*, the court placed a significant emphasis on the word "serving" in its present tense. The court reasoned:

> Courts have frequently looked to Congress' choice of verb tense to interpret statutes. *Carr v. U.S.*, 560 U.S. 438, 447 (2010). When a Court is determining the meaning of an Act of Congress, the present tense generally does not include the past. *Id.* (citing the Dictionary Act, 1 U.S.C. § 1). Congress, in enacting § 3346, used the present participle "serving," rather than the past or present perfect "served" or "has served." Section 3346(a) applies to "the person serving as an acting officer" under § 3345. By its terms, then, the section applies to the person presently serving in that capacity and not to a person who had previously served as Acting Commissioner.

*Brian T. D. v. Kijakazi*, 580 F. Supp. 3d 615, 626 (D. Minn. 2022).

The court disagrees that the language of 5 U.S.C. § 3346 states an individual must already be serving as acting officer on the date that a nomination is made in order to *continue* to properly serve in that role. Such an interpretation reads additional language into the text of the statute. The court finds that the text present in 5 U.S.C. § 3346 cross-references to 5 U.S.C. § 3345 and that it is 5 U.S.C. § 3345 of the FVRA that provides which individual "may serve." Thus, the language at 5 U.S.C. § 3346 is in the present tense, not because it serves as a limitation, but because it relates to the individual next designated to serve pursuant to the applicable section, Section 3345 of the FVRA. Moreover, the actual text of the statute does not mention any requirement that a

nomination be submitted within the initial 210-day period. The statute simply says that "*once* a first or second nomination . . . is submitted," the acting official designated under the FVRA may serve "for the period that the nomination is pending." 5 U.S.C. § 3346 (emphasis added).

The court is not alone in its rejection of the statutory interpretation in *Brian T.D*. As noted, four districts have issued similar rulings. In the Middle District of North Carolina, a district court noted "[c]omparison of the language of subsection (b)(1) with that of subsection (b)(2), however, makes clear that the word "serving" does not possess the talismanic significance the *Brian T.D*. court would like to assign it." *Brooks v. Kijakazi*, No. 1:21CV609, 2022 WL 2834345 at *18 (M.D.N.C. July 20, 2022). In that decision, the district court found that the decision in *Brian T.D*. glossed over the fact that interpreting the time limits of 5 U.S.C. § 3346(a)(1) to apply only those who had already served would render a nonsensical result, as it would make it impossible for anyone to serve. *Id*. at 18.

In *Bauer v. Kijakazi*, No. 21-CV-2008-KEM, 2022 WL 2918917 (N.D. Iowa July 25, 2022) this district joined with the *Brooks* decision in declining to follow the statutory interpretation of *Brian T.D* that 5 U.S.C. § 3346(a) applied only to an individual already serving. In *Bauer*, the district court reasoned, as had *Brooks*, 2022 WL 2834345, that the court in *Brian T.D*. erred in its interpretation of the word "serving." The court reasoned in *Bauer*:

> Subsection (a) refers to "the person serving as an acting officer as described under section 3345." Thus, "serving" is used to refer back to section 3345, which sets out who may serve as an acting officer (first assistants or certain other people directed by the President). While § 3345 provides who may serve as an acting officer, § 3346 sets the periods of time during which such persons may serve in that role. Significantly, the active verb in § 3346(a) is not serving, but "may serve": "the person . . . may serve" subject to the time limits set out in subsections (a)(1) and (a)(2). By using "may serve," Congress did not convey that the person had to be currently serving for the

> nomination rule in subsection (a)(2) to apply ("the person . . . may serve . . . once a . . . nomination . . . is submitted . . . from the date of such nomination for the period that the nomination is pending").

*Bauer v. Kijakazi*, No. 21-CV-2008-KEM, 2022 WL 2918917, at *5 (N.D. Iowa July 25, 2022).

The district court in the Eastern District of Virginia similarly declined to follow the interpretation of *Brian T.D.*, stating:

> *Brian T.D.* misreads the import of section 3346(a)'s prefatory language. The Magistrate Judge placed great weight on the present participle "serving," finding that "the section applies to the person presently serving in that capacity and not to the person who had previously served as Acting Commissioner." [*Brian T. D.*, 580 F. Supp. 3d at 626]. But the word "presently" does not appear in the full provision, which refers to "the person serving as an acting officer as described under section 3345 . . .." 5 U.S.C. § 3346(a) (emphasis added). A court "should give effect … to every word that Congress has used in a statute." *Conn. Dept. of Income Maint. v. Heckler*, 471 U.S. 524, 530 n.15 (1985) (citing *Reiter v. Sonotone Corp.* 442 U.S. 330, 339 (1979). When this qualifying clause is properly considered, the prefatory language has nothing to do with a period of "present service." Instead, it constrains section 3346(a)'s scope to individuals whose authority stems from the FVRA.

*Lance M. v. Kijakazi*, No. 2:21-CV-628, 2022 WL 3009122, at *13 (E.D. Va. July 13, 2022), *report and recommendation adopted,* No. 2:21CV628, 2022 WL 3007588 (E.D. Va. July 28, 2022).

The court finds the interpretation herein is further supported by the language at 5 U.S.C. § 3346(b). At 5 U.S.C. § 3346(a)(2) there is no language indicating that an individual serving might "continue" service, nor is there a cross reference to 5 U.S.C. § 3346 (b)(1) or (B)(2) regarding such. There is no stated or implied limitation on service to one already holding office as an acting officer. In contrast, 5 U.S.C. § 3346 (b)(1) states that if a nomination is rejected, withdrawn, or returned, "the person may *continue to serve* as the acting officer for no more than 210 days." 5 U.S.C. § 3346(b)(1) (emphasis added). Subsection (b)(2) also states that if a second nomination is

23

unsuccessful, "the person *serving* as the acting officer may *continue to serve*." 5 U.S.C. § 3346(b)(2).

To interpret 5 U.S.C. § 3346(a)(2) as Plaintiff suggests would be to find that Section 3346(a)(2) provides that no person may serve pursuant to the submission of a nomination unless they were "continuing service." The court agrees with *Bauer*, that the language "continue to serve" at Subsection (b)(1) and (b)(2) reinforces the conclusion that the interpretation in *Brian T.D.* is flawed. *See Bauer*, 2022 WL 2918917 at *6. The language of 5 U.S.C. §§ 3346(b)(1) and 3346(b)(2) is specific that if a nomination fails, the person currently serving as acting officer "may continue to serve." The language at 5 U.S.C. §§ 3346(b)(1) and 3346(b)(2) is specific, deliberate, and unambiguous, and makes clear that it restricts the office to one already serving. In stark contrast, 5 U.S.C. § 3346(a)(2) contains no such language and at no point indicates that such service is deemed a "continuing" service.

If the court were to interpret 5 U.S.C. §§ 3346(a)(2) as Plaintiff requests, doing so would not only add language to the text but would compound that error by including language which, in this context, appears to have been intentionally omitted. The court declines to do so.

### ii. The plain language of the Act does not support a conclusion that the word "or" at 5 U.S.C. § 3346(a) serves as a disjunctive which renders an individual not already serving as acting officer to assume office on submission of a nomination to the Senate ineligible to do so.

In *Brian T.D.*, the court further based its interpretation that 5 U.S.C. § 3346(a) precluded Berryhill from assuming a second term in office upon the submission of Andrew Saul's nomination on the following analysis of the meaning of the word "or":

> The word "or" modifies the entire provision that limits the acting officer to a period "no longer than" 210 days from the date the vacancy arose. Thus, when read with the entirety of subsection (a)(1) "or" serves to suspend that time limitation, not to create an entirely separate and distinct period of service. A person serving as an acting officer may do so "for no longer than 210 days beginning on the date the vacancy occurs; or . . . once a first or second nomination for the office is submitted to the Senate," during the

24

pendency of that nomination. *Id.* § 3346(a) (emphasis added). The ordinary usage of the word "or" is disjunctive, indicating an alternative. *United States v. Smith*, 35 F.3d 344, 346 (8th Cir. 1994).

*Brian T.D.* 580 F. Supp. 3d 615.

The court finds that the interpretation of the word "or" at 5 U.S.C. § 3346(a) in *Brian T.D.*,  making the two alternatives mutually exclusive, is mistaken.  The FVRA provides:

> **(a)**     Except in the case of a vacancy caused by sickness, the person serving as an acting officer as described under section 3345 may serve in the office—
>
> **(1)** for no longer than 210 days beginning on the date the vacancy occurs; *or*
>
> **(2)** subject to subsection (b), once a first or second nomination for the office is submitted to the Senate, from the date of such nomination for the period that the nomination is pending in the Senate.

5 U.S.C. § 3346 (emphasis added).

The court also finds that the court in *Brian T.D.* erred in its reliance on *Smith*. *Smith* is easily distinguished from *Brian T.D.* and the case at bar.  In *Smith*, the Eighth Circuit considered the language of a statute which barred prosecution for perjury unless "the declaration has not substantially affected the proceeding, or it has not become manifest that such falsity has been or will be exposed." *Smith*, 35 F.3d at 346.  The Eighth Circuit ruled that it was error to require an individual to prove both factors and that the word "or" in that context indicated that the two factors were alternatives but not that they were mutually exclusive. *Id*.  Specifically, the Eighth Circuit ruled that Smith should prevail if he proved the existence of either factor. *Id*.

The *Brian T.D.* court erred in relying on *Smith* to support its interpretation that the word "or" was exclusive rather than inclusive.  The Eighth Circuit in the *Smith* ruling found merely that the word "or" was disjunctive.  The plain language of the word "or" is defined by Miriam Webster Dictionary as that of a conjunction, "used as a function

25

word to indicate an alternative."[8]  The dictionary further provides that the archaic version of the word is "either."  *Id*.  Thus, as noted, it is possible for the word to be both inclusive and exclusive.

That the Eighth Circuit found "or" was used as a disjunctive in *Smith* resolved whether a declaration *must* fulfill both factors to allow a prosecution but not whether a declaration *may* satisfy both factors.  *Smith*, 35 F.3d at 346.  Whether both factors need apply hinges on whether the word is inclusive or exclusive—not on whether the word is conjunctive or disjunctive.  If "or" is inclusive, then both choices may apply, but if it is exclusive only one choice could apply.  *Smith* makes no determination whether the word "or" is inclusive or exclusive, as that finding was irrelevant to the issue before the Eighth Circuit.  *See id*.  Additionally, the court finds that such a determination can only be made on a case-by-case basis, as such meaning would differ depending upon the context in which the word was used.

> Here, the word 'or' appears in a permissive sentence, i.e., 'the person serving as an acting officer as described under section 3345 *may serve* in the office,' 5 U.S.C.  § 3346(a) (emphasis added), without qualifiers such as 'either' and 'but not both,' *see id*.  Accordingly, the court should interpret the word 'or' in Section 3346(a)(1) in its more common, inclusive sense to permit Berryhill, after serving as Acting Commissioner for 300 days following the vacancy under Section 3346(a)(1), to spring back into that role upon Saul's nomination to the Senate under Section 3346(a)(2).  *See N.L.R.B. v. SW Gen., Inc.*, 137 S. Ct. 929, 939, (2017).

*Brooks v. Kijakazi*,  2022 WL 2834345.

In *Bauer*, this district considered the statute's use of the word "or" contextually, finding that:

> According to *Brian T.D.* and *Richard J.M.*, the Deputy Commissioner's initial 100 days of acting service did not occur under subsection (a)(1), and now the length of service is governed by subsection (a)(2); but if the nomination had occurred on the 211th day of acting service, the time limits

---

[8] Miriam Webster Dictionary (11th ed.).  Retrieved from https://www.meriam-webster.com/dictionary/or.

in subsection (a)(1) would have already elapsed, and thus, subsection (a)(2) cannot apply. I find this reading incongruous with the statutory text, which sets out when an officer "may serve," not when that service must end. In the example, the better reading is that the Deputy Commissioner served as the Acting Commissioner under subsection (a)(1) during the initial 100 days, and the Deputy Commissioner served as the Acting Commissioner under subsection (a)(2) during the pendency of the nomination. Thus, the statute's use of "or" does not demonstrate that subsections (a)(1) and (a)(2) are mutually exclusive.

*Bauer*, 2022 WL 2918917, at *13.

The court finds that the language of 5 U.S.C. § 3346(a) is best interpreted to provide that once a nomination has been made for a permanent PAS officer, the appointment of the individual designated by 5 U.S.C. § 3345 has been triggered regardless of whether there is an acting officer already serving on the date the nomination was submitted.

Despite the court's finding that the plain language of the FVRA supports the statutory interpretation contained herein, in an abundance of caution the court will engage in the additional step of reviewing the legislative history of the FVRA as well, to determine whether it also supports the court's statutory interpretation.

### 3. The Second Canon of Statutory Interpretation: Following the Legislative Intent

A Senate Report ('the Report") accompanied the bill. The Report stated that if the initial time limitation triggered by the vacancy passed, an alternate period of service would be triggered upon the submission of a nomination. *See* S. REP. 105-250, 14 (1998). The Report provided that during the period between expiration of the initial term in office and the submission of nomination the office would remain vacant. *Id*. at 18. Significantly, the proposed language of Section 3346(a)(2) of the FVRA, which accompanied the Report, was identical to the language ultimately adopted and is also identical to the language considered herein. *Id*. at 25. Although legislative intent is determined by interpretation of the text, the intent here was explicitly stated in the Report.

As such, the legislative intent was that 5 U.S.C. § 3346(a)(2) would provide an additional period of service upon submission of a nomination even if the initial 210-day term had expired.

In her reply brief, Plaintiff argues that the legislative history is unclear. Specifically, Plaintiff cites to language in *N.L.R.B.*, 137 S. Ct. at 942–943, which addressed conflicting floor statements by Senator Fred Thompson and Senator Robert Byrd, arguing that the statements thus show that legislative history arguments are misguided. *See* Reply Brief at 6-9. Plaintiff errs by taking that language out of context. In *N.L.R.B.,* the court was not addressing the issue at hand and was, instead, addressing an issue in which conflicting floor statements had been made. In the case at bar, no such conflicting statements were made. Given that the statements of both Senator Thompson and Senator Byrd were that the bill contained a "springback provision" the court disagrees with Plaintiff that the statutory history is unclear and that only a plaintext interpretation of the FVRA would be appropriate. *See*, *N..L.R.B.*, 137 S. Ct. at 943 (quoting *Milner v. Department of Navy,* 131 S.Ct. 1259 (2011)) ("Those of us who make use of legislative history believe that clear evidence of congressional intent may illuminate ambiguous text.")

The court thereby finds that the legislative history of the Act also supports the statutory interpretation rendered herein. Thus, the court finds that pursuant to 5 U.S.C. § 3346(a)(2), an additional term of service as Acting Commissioner of Social Security was created upon the submission of the nomination of Andrew Saul to that office and that the person designated by the Succession Memorandum to serve pursuant to 5 U.S.C. § 3345 was able to serve as Acting Commissioner.

### 4. *Application of Fact and Law*

Having determined that 5 U.S.C. §§ 3345 and 3346 provided that upon the nomination of Andrew Saul on April 17, 2018, the next individual in order of succession would automatically assume the role of Acting Commissioner unless the president

designated another individual to the role, the court must then determine whether Nancy Berryhill was the person next in line of succession.[9]  The court finds that because Nancy Berryhill stepped down from her position as Acting Commissioner of Social Security at least on or before April 2, 2018, following the GAO's March 6, 2018, letter, and was properly serving as the DCO on April 17, 2018 (the date of Andrew Saul's nomination), she was the next person in order of succession pursuant to the Succession Memorandum.[10]  Berryhill's second term as Acting Commissioner of Social Security was not in violation of the FVRA and properly commenced on April 17, 2018.  Thus, the court finds that Berryhill's July 16, 2018, ratification of ALJ appointments was performed on Berryhill's ninetieth day in office during her second term as Acting Commissioner of Social Security and carried the full force of law.  Accordingly, the court will not remand as to this issue.

## VII.   CONCLUSION

In light of the foregoing, it is hereby **ORDERED**:

(1)    The final decision of the Commissioner of Social Security is **AFFIRMED in part and REVERSED and REMANDED in part;**  and

(2)    The Complaint (docket no. 4) is **REMANDED TO THE COMMISSIONER FOR FURTHER PROCEEDINGS**; and

(3)    The Clerk of the Court is **DIRECTED** to enter judgment accordingly and close this case.

---

[9] No evidence has been introduced nor has any party alleged that at the time Andrew Saul's nomination was submitted to the Senate, then-President Trump appointed another individual to serve as Acting Commissioner of Social Security or made any change to the terms of the Succession Memorandum then in place.

[10] Berryhill was not the first Deputy Commissioner of Operations to serve as Acting Commissioner pursuant to a succession memorandum.  From January 20, 2007, through February 11, 2007, DCO Linda S. McMahon served as Acting Commissioner pursuant to a succession memorandum.  *Social Security History, SSA Commissioners, Linda S. McMahon*.  www.ssa.gov/history/mcmahon.html.

**DATED** this 23rd day of January, 2023.

_____

LINDA R. READE, JUDGE
UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF IOWA